## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| VERNIECE RORIE,<br><br>        Plaintiff,<br><br>    v.<br><br>BOARD OF EDUCATION OF CHARLES COUNTY,<br>KIMBERLY HILL, *in her personal capacity,*<br>and<br>AMY HOLLSTEIN, *in her personal capacity,*<br><br>        Defendants. | Civil Action No. TDC-20-3173 |

## MEMORANDUM OPINION

Plaintiff Verniece Rorie, a 62-year-old African American woman currently employed as a Vice Principal by the Charles County Public Schools, has filed suit against the Board of Education of Charles County ("the Board"); Kimberly Hill, Superintendent of Charles County Public Schools ("CCPS"); and Amy Hollstein, Deputy Superintendent of CCPS, alleging race discrimination, age discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018), and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (2018); race discrimination, age discrimination, and due process violations under 42 U.S.C. § 1983 ("§ 1983"); race discrimination in violation of § 42 U.S.C. § 1981 ("§ 1981"); and state law claims of defamation and breach of contract based on her demotion from Principal to Vice Principal in the wake of an October 29, 2019 playground incident at Gale-Bailey Elementary School in Charles County ("the October 29, 2019 Incident"). Defendants have filed a Partial Answer responding to Rorie's Title VII and ADEA retaliation

claims and a Partial Motion to Dismiss the Amended Complaint as to her remaining claims. Having reviewed the briefs and submitted materials relating to the Motion, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.     October 29, 2019 Incident

On October 29, 2019 between 2:15 p.m. and 2:45 p.m., a number of fourth grade students at Gale-Bailey Elementary School ("Gale-Bailey") in Charles County, Maryland were playing a game of "monster tag" on the school playground. Am. Compl. ¶¶ 21–29, ECF No. 14. At some point during the game, one of the boys approached three of the girls, stated an interest in having sex with them using graphic language, and grabbed the hand of one of the girls. Two other boys stood nearby during the incident. All six of the students were about 10 years old at the time. The girls told the teachers supervising the playground about the incident, and at about 3:00 p.m., the three girls were sent to report it to Vice Principal Timothy Rosin, who was in charge of disciplinary matters. Rorie was on sick leave that day and was not present at Gale-Bailey.

CCPS had no written procedure for handling sexual incidents like the one on the playground, nor had CCPS provided staff with training on how to address such issues. Rosin instructed the three girls to each complete an Incident Statement Sheet ("Incident Sheet"). He then summoned to his office the three boys who had been present for the incident and directed them to complete Incident Sheets. By 4:00 p.m., the end of the school day, the girls had not completed their Incident Sheets, but Rosin dismissed them to ensure that they would not miss the school buses taking them home and instructed them to return to his office the next day to complete their Incident Sheets. Rosin instructed the students to inform their parents of the incident and separately made

2

phone calls to the parents and spoke to or left messages for them. At some point that day or the next, Rosin discussed the incident with Rorie.

The following day, on October 30, 2019, the three girls returned to school to complete their Incident Sheets but then left the school because their parents had decided that their children would not return to Gale-Bailey. The same day, Officers Eugene Caballero and James Plunkett, who were school resource officers employed by the Charles County Sheriff's Office, arrived at Gale-Bailey to conduct an investigation of the incident, which included assessing whether criminal charges should be brought against the boys. In accordance with protocol, Rosin did not take any disciplinary action while the investigation was ongoing.

Also on October 30, Rorie returned to Gale-Bailey from sick leave and contacted CCPS Executive Director of School Administration Linda Gill for instructions on how to proceed. Gill directed Rorie to contact CCPS Title IX Coordinator Kathy Kiessling to inform her of the incident, to contact the parents of the three boys to inform them that the students could face disciplinary action following the investigation, and to consider suspending the boys and moving them to another class. When Rorie spoke to Kiessling, Kiessling reiterated Gill's suggestion that all three boys be suspended, and Rorie inquired as to the possibility of transferring the boy who had made sexually explicit comments to another school.

On November 1, 2019, Officers Caballero and Plunkett concluded their investigation and told Rorie that the boy who had made the sexual comments would be charged as a juvenile with fourth-degree sexual assault and second-degree assault. He was transferred to another school and never returned to Gale-Bailey. Consistent with Kiessling's recommendation that the boys be suspended, the other two boys received and served three-day suspensions, then returned to school. Rorie was the school official who notified the boys of their suspensions.

3

The decision to charge one of the boys with a criminal offense was controversial and became a topic of discussion and rumor on social media. In the wake of the incident, more than 50 parents contacted Rorie seeking information about what had occurred. CCPS, citing the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (2018), tightly restricted what Rorie and Rosin were allowed to say about the incident, even to the parents of the students involved, and Deputy Superintendent Hollstein refused to allow Rorie to send a letter to all Gale-Bailey parents informing them of the incident.

On November 11, 2019, Rorie and Rosin met with Superintendent Hill, Hollstein, and Gill to discuss the October 29, 2019 incident. According to Rorie, Hill made unfounded accusations that Rosin had mishandled the incident. On November 13, 2019, Rorie submitted an Incident Report about the October 29, 2019 Incident and its aftermath, and that same day CCPS issued its first public statement about the incident. With the ensuing media coverage, which included reporting that the parents of the girls were upset that two of the boys were permitted to return to Gale-Bailey, some parents began demanding that Rorie and Rosin be removed from their positions and that Hill resign.

On November 15, 2019, Rosin was placed on administrative leave. In the November 22, 2019 edition of the Southern Maryland Chronicle, an online news publication, CCPS Communications Director Katie O'Malley-Simpson stated, "This is not the way this type of case should be handled and the individuals involved in making that decision are being retrained in the proper procedures and responses." Am. Compl. ¶ 123. On November 24, 2019, during an interview on local television station Fox 8, Hill stated, "I apologize to you for what happened to your daughter and any other child in this situation because it shouldn't happen" and promised that

4

staff members at Gale-Bailey would be retrained. Am. Compl. ¶ 127. Rorie asserts that despite these statements, neither she nor Rosin ever received any retraining.

Meanwhile, the parents of the three girls involved in the incident retained an attorney who held a press conference on November 25, 2019 and threatened to file a complaint against CCPS with the United States Department of Justice, Civil Rights Division. That same day, Rosin was suspended for five days without pay and reassigned to be the Vice Principal at another elementary school. To explain the decision, Hill sent Rosin a letter stating that while in charge at Gale-Bailey on October 29, 2019, he had not followed "county procedures regarding a suspected sexual assault on the playground." Am. Compl. ¶ 135. That letter informed Rosin that he would be receiving further communication from the Board about his rights, including the right to a hearing on the issue of the suspension.

On November 26, 2019, Hollstein removed Rorie from her post at Gale-Bailey, demoted her to Vice Principal, reassigned her to another school, and suspended her without pay for five days. Hollstein cited as reasons for these actions the school community's loss of confidence in Rorie, as well as an anonymous complaint about grade fraud. Unlike Rosin, Rorie did not receive a letter informing her of her right to a hearing. On November 26, 2019, CCPS issued a press release stating that both Rorie and Rosin had been removed from their positions at Gale-Bailey.

## II.    Grade Fraud Allegations

In March 2019, a Gale-Bailey special education teacher in a program specifically for autistic students known as "SOAR" (Structured teaching, Opportunities for social inclusion, Active learning, and Rigor) went on extended medical leave, and CCPS was unable to find a properly certified SOAR special education instructor to replace her. In September 2019, the CCPS Director of Special Education sent an email, with a copy to Hollstein, directing Rorie to inform

the parents of the affected students that three case managers would be assigned as temporary special education instructors for the students while CCPS continued its search for a qualified SOAR teacher. On September 28, 2019, Rorie sent a letter to SOAR parents to convey the message.

By November 2019, however, no SOAR-qualified replacement instructor had been found, so the temporary instructors were asked to give grades to the SOAR students. These case managers did not typically give grades and lacked access to Gale-Bailey's computerized grading system, and such access could be provided only by CCPS's central office. Accordingly, on November 5, 2019, in response to emails from CCPS central office staff directing Rorie to have the case managers issue grades to their students, including a message from Hollstein to Rorie asking for a status report on the matter, Rosin submitted a request to the relevant CCPS office for the three case managers to be granted access to the computerized grading system. When CCPS staff provided access to one of the three case managers, who was to enter the grades for the other two, the case managers became upset because they had not been trained in how to assess the students for purposes of academic grades and complained to Rorie that it was improper for them to assign grades. Although Rorie conveyed their views to Hollstein and other relevant CCPS staff, on November 5, 2019, they insisted that the case managers assign and enter academic grades for the SOAR students. Rorie then directed the case managers to do so. On November 26, 2019, Hollstein accused Rorie of "grade fraud" arising from the directive to case managers to provide grades for the SOAR students. Am. Compl. ¶ 183.

## III.    Comparator

In 2017, an HIV-positive teaching assistant at Benjamin Stoddert Middle School ("Stoddert") in Waldorf, Maryland, which is part of CCPS, was charged with sexually abusing 24

6

children and assaulting several of the students while on school property. CCPS waited for six months before informing Stoddert parents about the investigation into the sexual abuse, and in August 2017 parents confronted school officials over the allegations and called for Superintendent Hill to resign. At the time of these events, Kenneth Schroeck, a white man in his early 50s, was Principal of Stoddert. In the wake of the revelations, Schroeck was transferred to an administrative role but was neither demoted nor disciplined.

## IV. Procedural History

On May 15, 2020, Rorie filed a Charge of Discrimination against CCPS with the United States Equal Employment Opportunity Commission. In a June 16, 2020 letter responding to that initial charge, CCPS asserted that Rorie's suspension had been imposed for misconduct and willful neglect of duty.

On November 2, 2020, Rorie filed a Complaint in this Court, which she amended on April 27, 2021. The Amended Complaint asserts 15 causes of action: (1) a Title VII race discrimination claim against the Board based on allegedly discriminatory discipline; (2) an ADEA claim against the Board on the same basis; (3) a § 1983 race discrimination claim against Superintendent Hill; (4) a § 1983 race discrimination claim against Deputy Superintendent Hollstein; (5) a § 1983 ADEA claim against Hill; (6) a § 1983 ADEA claim against Hollstein; (7) a § 1983 due process claim against Hill; (8) a § 1983 due process claim against Hollstein; (9) a § 1981 race discrimination claim against Hill; (10) a § 1981 race discrimination claim against Hollstein; (11) a Title VII retaliation claim against the Board; (12) an ADEA retaliation claim against the Board; (13) a state law defamation claim against Hill; (14) a state law defamation claim against the Board; and (15) a breach of contract claim against the Board. Defendants filed a Partial Answer as to the retaliation claims in Counts 11 and 12 and filed a Motion to Dismiss as to the remaining counts.

In her memorandum in opposition to the Motion, Rorie concedes that the § 1981 claims in Counts 9 and 10 must be dismissed, so the Motion will be granted as to those two causes of action. The Court will thus address Defendants' arguments for dismissal of Counts 1-8 and 13-15.

## DISCUSSION

In their Motion, Defendants assert that the race and age discrimination claims under Title VII, the ADEA, and § 1983, alleged in Counts 1-6, should be dismissed because they are premised on a claim of discriminatory discipline, but Rorie fails to identify a viable comparator. As to Rorie's § 1983 claims of race and age discrimination and due process violations, Defendants seek dismissal on the grounds that Defendants are not subject to a § 1983 claim because they were acting in their official capacities, and that they are entitled to qualified immunity. Defendants seek dismissal of Rorie's defamation claims on the basis that she fails adequately to allege that the statements were made with actual malice or, in the alternative, the statements are opinions that are constitutionally protected. Lastly, Defendants argue that Rorie's breach of contract claim fails because she was required, but failed, to raise her grievances through a mandatory administrative appeals process and that the employment contract did not require notification of the right to a hearing.

## I.    Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

8

allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II. Title VII and ADEA Discrimination Claims

Title VII prohibits employment discrimination on the basis of race, 42 U.S.C. § 2000e-2(a), while the ADEA bars employment discrimination against individuals over the age of 40, 29 U.S.C. §§ 623(a)(1), 631(a). Both statutes require a plaintiff to establish a claim through one of two methods. The plaintiff may demonstrate through direct or circumstantial evidence that race or age "motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Alternatively, the plaintiff may proceed through the approach adopted in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination." *Hill*, 354 F.3d at 285. To state a *prima facie* claim for race or age discrimination based on disparate treatment such as through discriminatory discipline, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Under the ADEA, a plaintiff may establish the "similarly situated" prong with evidence that a substantially younger worker, not necessarily someone outside the ADEA's protected class, was given more favorable treatment. *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). Although a plaintiff does not necessarily need to allege facts sufficient to establish all elements of a *prima facie* case under Title VII or the ADEA in order to avoid dismissal under Rule

9

(12)(b)(6), a plaintiff nevertheless must plead facts sufficient to support a reasonable inference that an adverse employment action was motivated by bias or discrimination. *See McCleary–Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015).

There is no dispute that Rorie, who was 60 years old at the time of the relevant incident, was a member of a protected class for both race and age purposes, that she was subjected to an adverse employment action when she was demoted, or that she had satisfactory job performance up to that point. Defendants challenge the sufficiency of Rorie's allegations of a *prima facie* case only as to the fourth element, arguing that Rorie's offered comparator, Kenneth Schroeck, the Principal of Stoddert at the time of the allegations of sexual abuse by a Stoddert employee, was not similarly situated. In assessing whether there is a proper comparator, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). That showing typically includes evidence that, in relevant part, the employees "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct." *Hurst v. Dist. of Columbia*, 681 F. App'x 186, 191 (4th Cir. 2017) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)). "The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses

committed and the nature of the punishments imposed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985).

As an initial matter, the Court notes that although Schroeck, an individual in his early 50s, is a member of the ADEA's protected class, *see* 29 U.S.C. § 631(a), where there was possibly as much as a ten-year age gap between Schroeck and Rorie at the time each was subjected to discipline, the Court can plausibly infer that Schroeck was a "substantially younger" worker for purposes of an ADEA claim. *See Tolley v. Health Care & Ret. Corp.*, 133 F.3d 917, 1998 WL 24972, at *1, *3 (4th Cir. 1998) (unpublished decision) (finding that a 42-year-old comparator was "substantially younger" than a 51-year-old plaintiff while ultimately concluding that the plaintiff's ADEA claim failed for other reasons).

Turning to whether Rorie and Schroeck were similarly situated, both were principals at CCPS schools when allegations of sexual assault at their respective schools came to light, and though they were at different schools, both were subjected to discipline by CCPS leadership, including Superintendent Hill. In both instances, the alleged sexual assault led to adverse media coverage and significant complaints from school parents. Although the nature of the alleged sexual assault differed, the incidents that occurred while Schroeck was Principal of Stoddert appear to be far more serious than the incident that occurred at Gale-Bailey during Rorie's tenure. Under Schroeck, there were numerous incidents of alleged sexual abuse, as compared to the single incident that occurred under Rorie. As alleged in the Amended Complaint, the sexual assaults of children that occurred at Stoddert under Schroeck were more egregious than the non-consensual hand-holding and graphic comments underlying the October 29, 2019 incident at Gale-Bailey under Rorie. Further, the alleged perpetrator of the sexual assault at Stoddert was a member of Schroeck's staff, and thus someone presumably under his direct supervisory control, as opposed

to the perpetrator at Gale-Bailey, a 10-year-old, fourth grade boy. Despite allegations that permit the inference that the abuse on Schroeck's watch was more significant, both in the number incidents and the seriousness of assault, the discipline imposed by CCPS leadership upon Rorie was more severe: Schroeck was reassigned laterally, while Rorie was suspended without pay and demoted.

Defendants' attempts to distinguish Schroeck to the point that he could not be considered a valid comparator at this stage of the case are unpersuasive. Though the abuse took place at different schools and at different times, the CCPS leadership who supervised and disciplined the two principals were the same, the incidents occurred only two years apart, and Defendants point to no sea change in policies or procedures during those two years that would render the situations incomparable. Although Defendants note that Rorie has not alleged that Schroeck knew of or had reason to know of the abuse at Stoddert, where the Amended Complaint asserts that the incident at Stoddert resulted in media coverage and parent complaints, it is reasonable to infer that Schroeck, at a minimum, became aware of the abuse in his capacity as Principal even without having known about it at the time it occurred. Likewise, Rorie has alleged that she was on leave and therefore had no knowledge of the October 29, 2019 Incident at the time it occurred and no involvement in the initial response. Even assuming that Schroeck acted appropriately in response to the incident, where Rorie has repeatedly asserted that her actions were the result of following the instructions of Hill, Hollstein, and other CCPS leaders, she has alleged facts sufficient to support the conclusion that her handling of the incident was no more deficient than that of Schroeck, thereby drawing into relief the potential disparity in discipline. *See Moore*, 754 F.2d at 1105. Finally, though Defendants point to the allegations of grade fraud against Rorie as a

distinguishing factor, Rorie has alleged sufficient facts to support a conclusion that those allegations were baseless and pretextual.

Thus, where the Amended Complaint, viewed in the light most favorable to Rorie, presents a scenario where a younger, white Principal was faced with incidents of sexual abuse at his school that appear to have been far more serious and extensive and that generated a comparable public outcry, yet received no formal discipline from the same decisionmakers who demoted Rorie, Rorie has identified a similarly situated comparator so as to successfully allege a *prima facie* case of race and age discrimination at the pleading stage. Defendants' Motion will be denied as to the Title VII race discrimination claim in Count 1 and the ADEA age discrimination claim in Count 2.

## III. 42 U.S.C. § 1983

Section 1983 permits the filing of a civil action against a "person" acting under color of state law who causes a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. In the Amended Complaint, Rorie alleges claims against Superintendent Hill and Deputy Superintendent Hollstein under § 1983 for race discrimination (Counts 3 and 4) and age discrimination (Counts 5 and 6) under the Equal Protection Clause of the Fourteenth Amendment and due process violations (Counts 7 and 8) under the Fourteenth Amendment.

### A. Official Capacity

As a threshold matter, Defendants argue that the § 1983 claims against Hill and Hollstein must be dismissed because, although asserted against them in their personal capacities, those claims in fact relate to actions those Defendants took in their official capacities. In turn, claims against state officials in their official capacities are effectively claims against the state and are thus not proper claims against a "person," as required for a § 1983 claim. *See Will v. Michigan Dep't*

*of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). The Court disagrees. Distinctions in § 1983 claims between official capacity and personal capacity suits are "best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *See Hafer v. Melo*, 502 U.S. 21, 26 (1991) (rejecting the argument that a state agent may not be sued in the agent's personal capacity under § 1983 for actions taken within the agent's authority). The United States Supreme Court has expressly rejected the proposition Defendants advance here, that acts taken pursuant to a state official's authority cannot give rise to a personal-capacity action, finding that such an argument "finds no support in the broad language of § 1983" and "ignores" Supreme Court precedent holding that § 1983 was enacted "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Id.* at 28 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974)).

Defendants' cited authority does not lead to a contrary conclusion. In particular, *Biggs v. Meadows*, 66 F.3d 56 (4th Cir. 1995), the only controlling authority offered by Defendants, did not hold that acts taken as part of a state actor's official duties cannot give rise to a personal-capacity action, but instead sets forth a test to determine whether, when a complaint does not specify in which capacity a state actor is sued, the state actor should be construed as sued in an official or personal capacity. *Id.* at 58, 61. Here, Rorie has sued Hall and Hollstein in their personal capacities, so the problem addressed by *Biggs* is not presented here. Hall and Hollstein are thus properly subject to suit in their personal capacities for actions taken in the course of their duties.

14

### B.    Age Discrimination

Rorie's § 1983 age discrimination claims against Superintendent Hall and Deputy Superintendent Hollstein in their personal capacities must be dismissed because "the ADEA provides the exclusive judicial remedy for claims of age discrimination." *Zombro v. Balt. City Police Dep't*, 868 F.2d 1364, 1369 (4th Cir. 1989) (holding that the ADEA "foreclose[d] age discrimination suits under § 1983"). The Motion will therefore be granted as to Counts 5 and 6.

### C.    Race Discrimination

The standards for Title VII race discrimination claims apply to § 1983 race discrimination claims. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (noting that "the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under [Title VII, § 1983, and § 1981]"). Because the Court has already found that Rorie has pleaded a viable race discrimination claim under Title VII, her allegations are sufficient to support a race discrimination claim under § 1983. Defendants, however, also argue that these officials are entitled to qualified immunity from these claims.

Government officials sued in their personal capacities may invoke the protection of qualified immunity to bar a claim for civil damages under § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Henry v. Purnell*, 501 F.3d 374, 376-77 (4th Cir. 2007). When qualified immunity is asserted, a court must consider two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Henry*, 501 F.3d at 377. For qualified immunity to apply, only one of the

questions has to be resolved in favor of the defendant. *See Henry*, 501 F.3d at 377. Courts may address the questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Where, as discussed above, the Court has already found, at the motion-to-dismiss stage, sufficient allegations to support a claim of an equal protection violation based on race, qualified immunity would apply only if the right allegedly violated was not "clearly established" at the time of the incident. *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (citations omitted). Whether a right was "clearly established" turns on whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). In assessing this question, a court generally considers whether the right is found in "cases of controlling authority in [this] jurisdiction"—here, the Supreme Court, the United States Court of Appeals for the Fourth Circuit, and the Court of Appeals of Maryland—but it may also consider "a consensus of cases of persuasive authority from other jurisdictions" as a basis to find that the conduct was barred by clearly established law. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538-39 (4th Cir. 2017) (citations omitted). A court seeks to identify a case in which a government official "acting under similar circumstances ... was held to have violated" the right. *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017). Although the facts of such a case need not be "identical" to the present facts, *Safar*, 859 F.3d at 248, it should be "obvious" that the case applies to the facts, *White*, 137 S. Ct. at 552. Even if no court has found that the specific conduct in question violated an individual's rights, "if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question," the right may be clearly established. *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018).

16

Here, at the time of the events at issue, it was clearly established that a government employee may bring a Fourteenth Amendment equal protection claim under § 1983 based race discrimination in employment. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). It was also clearly established by controlling precedent that race discrimination in violation of Title VII also violates § 1983 when perpetrated by a state actor, *see Love-Lane*, 355 F.3d at 786 (stating that the elements to establish a Title VII and § 1983 race discrimination claim are "the same"), and that such a discrimination claim may be based on discriminatory discipline—when an employee of one race is intentionally given more severe discipline for a similar infraction than a person of a different race. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 276, 281-83 (1976) (finding a valid Title VII race discrimination claim based on the claim that a worker of one race was fired for misappropriating cans of antifreeze while a Black employee who engaged in the same misconduct was retained); *see also McDonell Douglas Corp.*, 411 U.S. at 801, 803-04 (holding that a company that refused to re-employ a Black employee because he had participated in an unlawful activity to block access to the company's plant could still be subject to a race discrimination claim unless "this criterion is applied alike to members of all races"). Where Rorie's race discrimination claim is likewise grounded in the clearly established right to be free from racially discriminatory discipline, Hill and Hollstein are not entitled to qualified immunity from Rorie's § 1983 race discrimination claims. The Motion will be denied as to Counts 3 and 4.

### D.    Due Process

In Counts 7 and 8, Rorie alleges § 1983 claims against Hill and Hollstein in their personal capacities on the grounds that they did not provide her with notice of her right to a hearing on her demotion and suspension without pay, in violation of the Fourteenth Amendment right to procedural due process of law. Although Defendants generally state that they are seeking dismissal

of these counts, they offer no specific argument for dismissal. Their argument therefore appears to be confined to their general claim that Hill and Holstein are entitled to qualified immunity on all § 1983 claims.

Based on the allegations in the Amended Complaint, dismissal based on qualified immunity is not warranted because Rorie has asserted a violation of a clearly established right and has provided sufficient allegations to state a plausible claim of a violation of that right. *See Saucier*, 533 U.S. at 201. As to the clearly established right, determining whether a plaintiff's procedural due process rights have been violated is a two-step process. First, the court must determine "[w]hether any procedural protections are due" by deciding whether a "liberty or property" interest within the meaning of the Fourteenth Amendment's Due Process Clause is at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Second, should the Due Process Clause attach, the court determines "what process is due," keeping in mind that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support [a] claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). A property interest in public employment can be created by state statute, local ordinance, or contract. *Bishop v. Wood*, 426 U.S. 341, 344 (1976); *Roth*, 408 U.S. at 576–77 (1972). The Supreme Court has found that the imposition of discipline against a public employee in violation of such procedures, including procedures that require that the employee have an opportunity to respond, can constitute a violation of procedural due process rights. *See Cleveland Bd. of Educ. v.*

18

*Loudermill*, 470 U.S. 532, 538, 547–48 (1985) (holding that an Ohio statute that entitled civil service employees to retain their positions unless there was cause for dismissal and set forth certain disciplinary procedures including an opportunity to respond "plainly creates" a property interest, and thus the plaintiff's allegation that he was deprived of a statutorily required chance to respond adequately stated a Fourteenth Amendment due process claim).  The Fourth Circuit has likewise found that a public employee with a statutory right to be terminated or suspended only for cause has, as a matter of due process, a right to notice and "some kind of a hearing" before such action is taken.  *See Garraghty v. Jordan*, 830 F.2d 1299, 1299 (4th Cir. 1987).  The right at issue was therefore clearly established at the time of Rorie's demotion and suspension.

Further, at that time and through the present, Maryland law included expressly adopted procedures to govern the suspension or dismissal of a public school employee, including a "teacher, principal, supervisor, assistant superintendent, or other professional assistant," by the relevant county board of education "on the recommendation of the county superintendent" on grounds including "[w]illful neglect of duty."  Md. Code Ann., Educ. § 6-202(a)(1) (LexisNexis 2018).  Before such an employee may be removed from a position for that reason, "the county board of education shall send the individual a copy of the charges against the individual" and give the individual an opportunity to request a hearing.  *Id.* § 6-202(a)(2)(i).  Based on this statutory scheme, at the time of the events at issue, it was clearly established that Rorie had a protectable due process property right relating to her removal from the position of Principal, namely the process set forth in section 6-202.  *Loudermill*, 470 U.S. at 547–48; *Wilson*, 526 U.S. at 614; *Anderson*, 483 U.S. at 640.

Turning to whether Rorie has alleged sufficient facts to state a plausible violation of her due process rights, Rorie has alleged that she was suspended without pay, removed from her

position as Principal, and demoted to the position of Vice Principal without having received the statutorily required copy of the charges against her and was not given an opportunity to request a hearing before the discipline was imposed. Where state law sets forth specific disciplinary procedures and Rorie asserts that those procedures were not followed, the Court finds that, at this stage, she has sufficiently alleged a violation of a protected property interest in her position as Principal for purposes of a Fourteenth Amendment due process claim. *See Loudermill*, 470 U.S. at 547–48.

However, whether Hill and Hollstein can each be held liable in their personal capacities for a violation of that right is a separate question. Notably, section 6-202 requires the "county board" to provide the required notice, and the county board's decision to suspend, dismiss, or remove an individual is to be taken "on the recommendation of the county superintendent." Md. Code Ann., Educ. § 6-202(a)(2)(i), (a)(1). Where the statute confers no power or duties on a deputy superintendent in the disciplinary process, the Court concludes that Hollstein had no due process obligations to Rorie, such that Rorie has failed to state a § 1983 procedural due process claim against her.

The Motion will therefore be granted as to Count 8, Rorie's § 1983 due process claim against Deputy Superintendent Hollstein, but will be denied as to Count 7, Rorie's § 1983 due process claim against Superintendent Hill in her personal capacity.

### E.    Defamation

Defendants seek dismissal of Rorie's defamation claims on the grounds that Rorie has not sufficiently pleaded actual malice, and that the relevant statements are constitutionally protected opinions. To establish a *prima facie* case of defamation under Maryland law, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement

known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm. *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). Under the first element, a defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* (quoting *Rosenberg v. Helinski*, 616 A.2d 866, 871 (Md. 1992)). Under the second element, a statement is "false" if it was "not substantially correct." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012).

Generally, establishing the third element that a defendant is legally at fault requires a showing that, at a minimum, the party making the false statement acted negligently. *Hearst Corp. v. Hughes*, 466 A.2d 486, 490–92 (Md. 1983). However, when, as here, the plaintiff is a public figure, the standard is actual malice. *Capital-Gazette Newspapers, Inc. v. Stack*, 445 A.2d 1038, 1043 (Md. 1982); *Kapiloff v. Dunn*, 343 A.2d 251, 258 (Md. Ct. Spec. App. 1975) (finding that the plaintiff, a high school principal, was a public figure for purposes of his libel claim). Actual malice is established by showing that the speaker made the statement with actual knowledge that it was false or with reckless disregard for its truth. *Hearst Corp.*, 466 A.2d at 490.

On the fourth element, harm is presumed if the statement was defamatory *per se* in that the injurious character of the statement is self-evident, and if the plaintiff can demonstrate actual malice. *Hearst Corp.*, 466 A.2d at 493; *Samuels v. Tschechtelin*, 763 A.2d 209, 245 (Md. Ct. Spec. App. 2000). If the defamation is *per quod*, in that the factfinder must determine whether the statement is in fact defamatory, the plaintiff must show that the words caused actual damage. *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979); *Samuels*, 763 A.2d at 245.

Rorie asserts two claims of defamation, one against Superintendent Hill and the other against the Board, based on the same two statements. The first is CCPS Communications Director

21

O'Malley-Simpson's November 22, 2019 statement to the Southern Maryland Chronicle, "This is not the way this type of case should be handled and the individuals involved in making that decision are being retrained in the proper procedures and responses." Am. Compl. ¶¶ 123, 224, 228. The second is Hill's November 24, 2019 statement on local news station Fox 8 that staff members would be retrained and that "I apologize to you for what happened to your daughter and any other children in this situation because it shouldn't happen." *Id.* ¶¶ 127, 225, 229.

Construing the allegations facts in the light most favorable to Rorie, the Court finds that her defamation claims may proceed. As to O'Malley-Simpson's statement, Rorie alleges that the statement that "the individuals involved in making that decision are being retrained in the proper procedures and responses," Am. Compl. ¶ 123, was knowingly false because "the individuals involved" was a clear reference to Rorie and Rosin, and neither received or ultimately received any retraining, nor were any new, proper procedures or responses put in place. Where this statement could reasonably be construed as taking the position that Rorie and Rosin had mishandled the October 29, 2019 incident, the statement could qualify as defamatory in that it tended "to expose a person to public scorn, hatred, contempt or ridicule," particularly in light of the significant criticism that Gale-Bailey parents were already expressing, including calling for Hill's resignation and the removal of Rorie and Rosin from their positions. *Gohari*, 767 A.2d at 327.

Because O'Malley-Simpson was speaking on behalf of the Board and had been participating in the internal discussions about CCPS's response to the incident, including informing Rorie that she was not to issue a letter to parents about the incident, it would be reasonable to infer that O'Malley-Simpson either had knowledge of the fact that Rorie had not mishandled the incident and instead had faithfully followed directions from CCPS leadership, and

22

that Rorie was not being subjected to any retraining to address mistakes, or at a minimum that O'Malley-Simpson made the statement with reckless disregard for whether it was true. *See Hearst Corp.,* 466 A.2d at 490. Finally, Hill could be legally responsible for O'Malley-Simpson's statement because, "[a]n officer or managing employee may be liable for a co-employee's tortious conduct if he or she participated in or directed the conduct." *Balt. Police Dep't v. Cherkes,* 780 A. 2d 410, 440 (Md. Ct. Spec. App. 2001). At this preliminary stage, where Rorie's allegations reflect that Hill was actively involved in managing the response to the October 29, 2019 incident, the allegations can be construed as supporting the inference that O'Malley-Simpson's statements were made at the direction of, or with the participation of, Hill.

As for Hill's statement, the part in which she said, "I apologize to you for what happened to your daughter and any other child in this situation because it shouldn't happen," is not alone actionable because there is nothing false about it, and the view that "it shouldn't happen" is a clear reference to the misconduct of the fourth grade boys. Am. Compl. ¶ 127. However, for the same reasons discussed in relation to O'Malley-Simpson's similar statement, Hill's additional statement that staff members would be retrained was false. Where Hill was the Superintendent of CCPS and, like O'Malley-Simpson, was actively involved in the response to the October 29, 2019 incident, it can likewise be fairly inferred that Hill had knowledge of the falsity of her statement about retraining, or that, at least, she had a reckless disregard for its truth. The defamation claims may therefore proceed.

Defendants' argument that certain portions of the statements at issue are opinions, including O'Malley-Simpson's statement, "This is not the way this type of case should be handled," does not alter this conclusion. *Id.* ¶ 123. Although Defendants are correct that this statement can be categorized as an opinion, they are incorrect that such opinions are necessarily

constitutionally protected speech that cannot form the basis for a defamation claim. Opinions based on disclosed facts are protected speech. *See, e.g., Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) ("When the bases for the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." (citation omitted)). However, "'[a] statement, even if expressed in terms of an opinion, can be defamatory under certain circumstances," including "[w]hen the underlying facts used to form the opinion are not given along with the defamatory statement," in which case "the statement itself may be treated as being factual and therefore potentially defamatory." *Murray v. United Food & Com. Workers Int'l Union*, 289 F.3d 297, 306 (4th Cir. 2002) (quoting *Peroutka v. Streng*, 695 A.2d 1287, 1297 (Md. Ct. Spec. App. 1997)); *see Hearst*, 466 A.2d at 496 (noting that the Restatement of Torts (Second) "distinguishes between 'pure' and 'mixed' opinions," that a "'pure' opinion is one in which the speaker discloses the facts on which he bases his opinion of the plaintiff," and that "a defamation action may not be maintained for a 'pure' opinion, no matter how unjustifiable, derogatory or vituperative the opinion may be"). In particular, a statement made in the form of an opinion may be actionable "if it implie[s] the allegation of undisclosed facts as the basis for the opinion." *Peroutka v. Streng*, 695 A.2d 1287, 1298 (Md. Ct. Spec. App. 1997) (citing the Restatement (Second) of Torts).

On this theory, O'Malley-Simpson's statement that the October 29 Incident had not been properly handled could potentially be the basis for a defamation claim, because it implies undisclosed facts as to errors in how the case was handled and how that handling may have diverged from existing, proper procedures. Crediting Rorie's assertion that she handled the incident entirely in accordance with the instructions she received from Hill and Hollstein and that no procedures were in place to which she could have adhered, the Court can plausibly infer that

24

the implied, undisclosed facts that Rorie mishandled the incident were false and that O'Malley-Simpson, as an allegedly active participant in handling the case, knew as much.

The Court thus finds that Rorie has adequately pleaded claims for defamation. The Motion will be denied as to Counts 13 and 14.

### F.     Breach of Contract

Rorie also asserts a breach of contract claim. In Maryland, "to prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.,* 776 A.2d 645, 651 (Md. 2001).

Here, Rorie does not identify any particular contract and instead asserts only that the Board was in breach of "its contract with Ms. Rorie" when it violated her due process rights. Am. Compl. ¶ 232. In particular, Rorie nowhere describes any employment contract she had with the Board or any of the terms of such a contract. Although she references the implied covenant of good faith and fair dealing, that doctrine applies only when there is an actual contract between the parties. *See E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 182, 184 (4th Cir. 2000) (holding that Maryland law recognizes an implied covenant of good faith and fair dealing in all negotiated contracts, but that the implied covenant imposes no "new obligations about which the contract is silent" because "[a]n implied duty is simply a recognition of conditions inherent in expressed promises"). Where the Amended Complaint does not even allege facts showing that there was a contract between Rorie and the Board, the breach of contract claim will be dismissed.

25

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. It will be granted as to Rorie's § 1983 age discrimination claims (Counts 5 and 6), § 1983 due process claim against Deputy Superintendent Hollstein (Count 8); § 1981 claims (Counts 9 and 10), and breach of contract claim (Count 15). It will otherwise be denied. A separate Order shall issue.

Date: September 21, 2021

THEODORE D. CHUANG
United States District Judge