## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| VERNIECE RORIE,<br><br>     Plaintiff,<br><br>     v.<br><br>BOARD OF EDUCATION OF CHARLES COUNTY,<br>KIMBERLY HILL, *in her personal capacity,*<br>and<br>AMY HOLLSTEIN, *in her personal capacity,*<br><br>     Defendants. | Civil Action No. TDC-20-3173 |

## MEMORANDUM OPINION

Plaintiff Verniece Rorie has filed this civil action against the Board of Education of Charles County, Maryland ("BOE"), Charles County Public Schools ("CCPS") Superintendent Kimberly Hill, and CCPS Deputy Superintendent Amy Hollstein, alleging that her five-day suspension and her 2019 demotion from the position of Principal of Gale-Bailey Elementary School to Vice Principal of F.B. Gwynn Educational Center constituted race discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018), as well as age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634 (2018). She also alleges race discrimination and due process violations under 42 U.S.C. § 1983 ("§ 1983") and state law claims of defamation. Pending before the Court is Defendants' Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is

R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. The Playground Incident

Beginning in July 2015, Rorie was the Principal of Gale-Bailey Elementary School ("Gale-Bailey"), a school within the CCPS, located in Marbury, Maryland. On October 29, 2019, Rorie was on sick leave and was not working at Gale-Bailey. That afternoon, several fourth-grade students were playing "monster tag" on the Gale-Bailey playground. Joint Record ("J.R.") 32, ECF Nos. 55-62. At some point, a group of three fourth-grade boys blocked a group of four fourth-grade girls from leaving a plastic play tube on the playground. Shortly after, the girls reported to a teacher supervising the recess period that the boys were making ugly comments to them. The teacher reported the matter to Timothy Rosin, the Vice Principal of Gale-Bailey, who was in charge that day due to Rorie's absence. Rosin called the students into his office and asked them to write statements about the incident. The students were unable to finish their statements before the end of the school day. Because the school buses were departing, Rosin sent them home and told them that they could finish the next day. Once the students were on their school buses, with some of the boys and some of the girls riding the same bus, Rosin telephoned the parents of the involved students to let them know what had happened. Up to this point, Rorie had no knowledge of the playground incident that day.

At approximately 5:00 p.m., Rosin called Rorie to inform her about the playground incident and the actions he took in response, including that the students had been sent home on their school buses and would finish their statements in the morning. Although Rosin stated that the girls had

2

claimed that the boys had made ugly or lewd comments, he did not have the details of any particular statement.

When Rorie arrived at Gale-Bailey the next morning at approximately 7:30 a.m., she was met by two of the girls, one parent of each of the two girls, and two CCPS School Resource Officers ("SROs"), one of whom was regularly assigned to Gale-Bailey. The parents, upon learning of the incident, had called the Charles County Sheriff's Office ("CCSO"), which had apparently arranged for the SROs to come to Gale-Bailey to investigate. When Rorie met with the SROs and the parents, one of the parents told her that during the playground incident, one of the boys had threatened to rape his daughter. Rorie told them that the girls' statements had not yet been finished, and Rosin gave the unfinished statements to the SROs, who then arranged to have the girls complete them. The girls were then taken home by their parents. According to Rorie, three of the girls involved in the incident never returned to Gale-Bailey after October 30, 2019.

Immediately after the meeting with the SROs and the parents, Rorie telephoned Linda Gill, her immediate supervisor in the CCPS Central Office, to inform her about the playground incident and the SRO investigation. Gill directed Rorie to call Kathy Kiessling, the CCPS Title IX coordinator. According to Rorie, both Gill and Kiessling instructed Rorie to let the SROs to finish their investigation.

On November 1, 2019, the three boys each received a three-day suspension from school, and one received a further suspension. One was moved to another school. Upon the conclusion of the SRO investigation, one student was criminally charged. Meanwhile, because all three boys and three of the girls had been in the same class, on November 1, 2019, one or more of the boys was reassigned to the only other classroom at the same grade level. Although the fourth girl was

already a student in that classroom, the girl's mother was notified of the transfer but declined to have her daughter moved to a different class.

After receiving a November 4, 2019 letter from one of the girls' parents, Rorie called the parent to discuss the matter and told the parent that disciplinary action was being taken but that she could not discuss the nature of it. At some point, Rorie learned that, later in the day on October 29, 2019, one of the boys had threatened to kill one of the girls for reporting the incident. Rorie followed an established process by which a threat assessment team evaluated the threat and concluded that it was a low-level threat.

In the aftermath of the playground incident, multiple parents of Gale-Bailey students contacted the school to voice their concerns about what had transpired on the playground and expressing frustration at the lack of information shared about the incident. In light of these widespread parental concerns, Rorie called the CCPS public media specialists to request permission to send a letter to Gale-Bailey parents explaining the playground incident and the school's response to it. Her request was denied by CCPS Director of Communications Katherine O'Malley-Simpson, who told her that Deputy Superintendent Hollstein did not want her to send such a letter.

On November 11, 2019, Rorie met with Superintendent Hill, Hollstein, Gill, and Rosin. Although Rorie brought a timeline of the events during the playground incident and its aftermath to review with these school officials, she did not have the opportunity to present it. Without discussing the playground incident specifically, Hill told Rorie that the community had lost faith in her and that "you've given me nothing." J.R. 44. Rorie was not given an opportunity to respond to Hill. The meeting ended after approximately two minutes. On November 12, 2019, after the

4

November 11 meeting, Rorie sent an email again making a request for permission to send a community letter, which was denied.

During November 2019, the playground incident at Gale-Bailey garnered significant community and press attention. On November 22, 2019, the Southern Maryland Chronicle published an article entitled "Fourth-grade students accused of sexually assaulting classmates; one charged." J.R. 216. O'Malley-Simpson was quoted in the article:

> When asked why the accused were allowed in the classroom with the alleged victims O'Malley-Simpson says, "This is not the way this type of case should be handled and the individuals involved in making that decision are being retrained in the proper procedures and responses."

J.R. 218. The same news source published a written statement from the victims' parents calling for the removal of the CCPS leadership, teachers, and students involved in the playground incident.

On November 24, 2019, FOX 8 local news digital desk published an article entitled "4th grader charged with sexual offense after acting out assault with girl on school playground, officials say." J.R. 222. The article reported that the father of one of the victims wanted the Principal and Vice Principal of Gale-Bailey fired. The article also stated that, at a school safety town hall meeting, "The superintendent of schools promised staff members would be retrained and said: 'I apologize to you for what happened to your daughter and any other child in this situation because it shouldn't happen.'" J.R. 223.

## II.    Grade Fraud Allegations

During the same month, November 2019, Rorie was addressing an issue relating to the SOAR Program (Structured teaching, Opportunities for social inclusion, Active learning, and Rigor), a CCPS special education program that was housed in the Gale-Bailey school building but was a regional program with its own administrator and staffing and thus was not under Rorie's direction and supervision. At the beginning of the 2019-2020 school year, CCPS had failed to hire

5

a special education teacher for the eight SOAR students, so the SOAR program began the school year without a teacher. Although Rorie spoke regularly with CCPS Director of Special Education Arden Sotomayor about getting a SOAR teacher placed at Gale-Bailey, no teacher was found. As a result, the SOAR students were placed in different classrooms with teachers who were not specifically hired for the SOAR program, and they were not listed in the teacher's gradebooks, so by the end of the first quarter of the school year, there were no grades entered for the SOAR students.

Upon realizing that the SOAR students had no grades, CCPS Central Office officials, including Hollstein and Sotomayor, directed Rorie to ensure that grades were entered for SOAR students. Rorie received an email from Hollstein asking why she had not arranged for the grades to be entered. Rorie met with the teachers of the SOAR students and was told that they did not even have access to the online grading system so that they could enter grades for the SOAR students. She reported this information to Sotomayor and asked for instructions. In the absence of a specific way to meet the CCPS directive of entering grades for the SOAR students, Rorie held a meeting on November 18, 2019 with the teachers in whose classrooms the SOAR students had been placed to discuss the issue. After teachers identified other problems with providing grades, such as that they had not known that they were supposed to grade the SOAR students and as a result had sent all SOAR students' written work home, Rorie suggested that the teachers assign grades by evaluating the SOAR students' progress on their Individualized Education Program ("IEP") goals and using the report card as a mechanism to reflect such progress. After the meeting, she called Sotomayor to report on this approach, and Sotomayor stated that it sounded fine.

The next day, on November 18, 2019, a complaint was left in the CCPS "See Something, Say Something" anonymous reporting system in which a teacher reported that Rorie had proposed

6

that they give "subjective" grades to the SOAR students and expressed discomfort with the direction. J.R. 146. On November 22, 2019, the CCPS Director of Accountability, Cliff Eichel, signed a document listing the findings of an "investigation of possibly falsifying grades" at Gale-Bailey, which included that although the teachers of SOAR students told her that they had no grades for the SOAR students, Rorie told them that "there needed to be grades for these students" and that they "should be based on observation not data." J.R. 147. The investigation concluded that "students were falsely assigned quarter 1 grades." *Id.*

**III.   Suspension and Demotion**

On November 19, 2019, at the request of Hollstein, Rorie was interviewed as part of a CCPS investigation. In a report of the interview signed on December 30, 2019, the CCPS investigator concluded that: (1) the parents should have been contacted prior to the students' dismissal on October 29, 2019; (2) the students should not have been placed on the school bus together that day; (3) "the aggressor and victims" should not have remained in the same class; and (4) the CCSO and the CCPS Central Office should have been notified of the playground incident on the day it occurred. J.R. 145. Although in the interview, Rorie had reported that the identified acts or omissions which took place on the day of the incident, including the failure to notify the Central Office and the placement of the students together on the bus, were Rosin's actions, not her own, the investigator concluded that the charge of misconduct in office was "founded." J.R. 143.

On November 26, 2019, Rorie attended a meeting with Hollstein, CCPS Assistant Superintendent for Human Resources Nikial Majors, and Bill Fisher, Rorie's union representative. At this meeting, Rorie was told that the community had lost faith in her, was asked about the grades issued to SOAR students, and was told that the correct grades were not entered. Hollstein then

informed Rorie that she would be reassigned to be Vice Principal of the F.B. Gwynn Educational Center and that Hill had recommended that she receive a five-day suspension without pay.

In a December 2, 2019 letter addressed to Rorie, Hill stated that she was recommending the suspension due to "misconduct in office and willful neglect of duty" based on Rorie's mismanagement of the playground incident and failure properly to ensure that correct grades were entered for the SOAR students. J.R. 148. The letter also informed her that she was being "reassign[ed]" to the position of Vice Principal of the F.B. Gwynn Center, but that she would be allowed to maintain her current salary for two years. *Id.* According to Rorie, however, she did not receive this letter at that time.

On December 10, 2019, Rorie received a letter from Virginia McGraw, the Chair of the BOE. That letter stated that the BOE had received Hill's recommendation that Rorie be reassigned to be a vice principal and that she be suspended without pay for five days, stated that the grounds for these actions were explained in the December 2, 2019 letter, and informed Rorie that she was entitled to a hearing on the grounds for the suspension, which she understood to include the claim that she had falsified grades or was engaged in grade fraud. After she received the letter, Rorie sought advice from her union representative. He advised her that although she could request a hearing before the BOE, it would likely be futile because the BOE rarely overturns its decisions. According to Rorie, she decided not to request a hearing based on this advice and the fact that she did not "trust the system at this point," particularly where the allegations included grade fraud, which had led to criminal charges in other instances. J.R. 63.

Rorie reported for her new role as Vice Principal of the F.B. Gwynn Educational Center in early December 2019. At that time, she was charged seven days of leave without pay. Pursuant to the terms of Hill's involuntary transfer and the collective bargaining agreement, her pay

8

remained the same.  However, after two years, her pay could be reduced to the rate applicable to a vice principal position.  Rorie retired from CCPS on July 1, 2021, before any pay decrease could take effect.

## IV.   Procedural History

On May 15, 2020, Rorie filed a Charge of Discrimination ("the Charge") with the United States Equal Employment Opportunity Commission ("EEOC") in which she alleged race and age discrimination relating to these events.  On June 16, 2020, the BOE submitted a statement to the EEOC in which it acknowledged that Rorie had been suspended without pay and involuntarily transferred to a vice principal position, asserted that it had legitimate non-discriminatory reasons for these employment actions, and attached Hill's December 2, 2019 letter.  According to Rorie, she had not received the December 2, 2019 letter at any point prior to her receipt of the BOE's EEOC response.

On November 2, 2020, Rorie filed her Complaint in this Court, which she amended on April 27, 2021.  Defendants filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), which was granted in part and denied in part.  The following claims remain:  in Count 1, a claim against the BOE for race discrimination, in violation of Title VII; in Count 2, a claim against the BOE for age discrimination, in violation of the ADEA; in Count 3, a claim against Hill under § 1983 for race discrimination in violation of the Fourteenth Amendment to the United States Constitution; in Count 4, a § 1983 claim against Hollstein for race discrimination; in Count 7, a claim against Hill under § 1983 for a violation of due process under the Fourteenth Amendment; in Count 11, a claim against the BOE for retaliation under Title VII; in Count 12, a claim against the BOE for retaliation under the ADEA; in Count 13, a defamation claim against Hill; and in Count 14, a defamation claim against the BOE.

## DISCUSSION

In their Motion, Defendants seek summary judgment under Federal Rule of Civil Procedure 56 based on their assertion that there are no genuine issues of material fact and that based on the record evidence, no reasonable jury could find in favor of Rorie on any of her claims.

### I.    Legal Standard

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### II.    Race Discrimination

In Counts 1, 3, and 4, Rorie alleges race discrimination in violation of Title VII and the Fourteenth Amendment.  The standards for § 1983 claims of race discrimination in public employment are the same as those for Title VII race discrimination claims, so the claims may be analyzed together. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).  A claim of race discrimination in employment may be established through one of two methods.  The plaintiff may either demonstrate through direct or circumstantial evidence that discrimination motivated the adverse employment action, or the plaintiff may proceed through the approach espoused in

10

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973), under which the plaintiff must establish a *prima facie* case of discrimination; upon such a showing the defendant must provide evidence of a legitimate, non-discriminatory reason for the action; and if such evidence is presented, the plaintiff must demonstrate that the articulated reason was actually a "pretext for discrimination." *Love-Lane*, 355 F.3d at 786. Because Rorie alleges no direct evidence that the relevant employment actions were based on race discrimination, she must establish her claims through the *McDonnell Douglas* framework.

### A. *Prima Facie* Case

To establish a *prima facie* case of race discrimination in employment under the *McDonnell Douglas* framework, a plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) [an] adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015). Defendants do not dispute that Rorie, who is Black, is a member of a protected class. They also do not seriously dispute that a suspension without pay and a demotion from principal to vice principal, a position with a lower level of responsibility that exposed Rorie to a pay decrease after two years, are adverse employment actions under Title VII. *See, e.g., James v. Booz-Allen Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (stating that a reassignment to a position with a lower level of responsibility or a decrease in compensation can be an adverse employment action); *Agelli v. Sebelius*, 466 Fed. App'x 174, 175 (2012) (finding that a three-day suspension without pay is an adverse employment action under Title VII). However, they dispute the second and fourth prongs by arguing that Rorie's job performance was not satisfactory, and that, to the extent Rorie was treated differently than an identified comparator

11

outside of the protected class, it was due to the fact that the comparator was not similarly situated to Rorie.

On the second prong, satisfactory performance, Rorie has introduced evidence that, at a minimum, creates a genuine issue of material fact. For the 2015-2016 school year, Rorie was rated "Highly effective" in her overall performance review, and in the 2016-17 and 2017-18 years, she was rated "Effective." J.R. 23–24. In addition, Rorie's salary increased for each of the three years leading up to and including the 2019-2020 school year. Rorie has therefore produced evidence, consisting of her supervisors' assessments of her work, from which a jury could conclude that she met the reasonable expectations of her employer. *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (stating that "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff" (citation omitted)).

Defendants claim that Rorie's alleged mishandling of the playground incident demonstrates a lack of satisfactory job performance misapplies the standard. When a defendant in a case involving alleged discriminatory discipline points to the offense for which the plaintiff was disciplined, that conduct is most appropriately viewed as relevant to the analysis of whether there is a legitimate non-discriminatory reason for the adverse employment action, not whether the plaintiff had satisfactory job performance. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1106 (4th Cir. 1985). Even if the alleged mishandling of the playground incident could be considered, as discussed below, there are genuine issues of material fact on whether Rorie was at fault for that incident to the degree claimed by Defendants. *See infra* part II.C. Rorie's evidence of satisfactory performance prior to the incident in question is sufficient to satisfy this prong.

As for the fourth prong, where Rorie has sought to establish this element through a comparator, the relevant inquiry is "whether there are sufficient commonalities on the key

12

variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017). As noted in the Court's denial of the Motion to Dismiss, Rorie identified a similarly situated comparator outside the protected class, Kenneth Schroeck, a white man, who also presided over a sexual assault scandal at a CCPS school. The record evidence establishes that Schroeck was Principal of Benjamin Stoddert Middle School when an instructional assistant was criminally charged with sexually abusing 24 students, and in response to community outrage over the incident, CCPS reassigned Schroeck to the position of Senior Project Manager in the CCPS Office of Supporting Services, a lateral position at the same pay grade which came with the use of a CCPS vehicle. Unlike Rorie, he was not demoted and was not suspended without pay for any period of time. Rorie and Schroeck were both school principals with the same job duties, were subject to discipline by the same supervisor, and, as the Court found in denying the Motion to Dismiss, the incidents could be deemed to be of "comparable seriousness." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282, 283 n.11 (1976) (noting that identification of acts "of comparable seriousness" could be sufficient under *McDonnell Douglas*); *Rorie v. Bd. of Educ. of Charles Cnty.* ("*Rorie I*"), No. TDC-20-3173, 2021 WL 4290872, at *6 (D. Md. Sept. 21, 2021).

Defendants argue that Schroeck is not a valid comparator because he was not aware of the sexual abuse when it was occurring and because he was not deemed to be at fault for failing to detect the abuse. However, both Schroeck and Rorie were unaware of the abuse at their schools while it was occurring and learned of the specific allegations only after law enforcement had become involved. The evidence demonstrates that Rorie was on leave and not on duty at Gale-Bailey when the playground incident occurred on October 29, 2019, such that she had no

13

knowledge of, and no role in, the initial response to the incident. Many of the key decisions that were later criticized, including the decisions to send the children home on the school buses before their statements were finished and to allow some of the alleged perpetrators and victims to travel on the same bus, were made by Rosin, not Rorie, before he had even informed Rorie that the incident had occurred. In particular, Rorie maintains that she was not told that there had been a threat of sexual assault until the next morning. Viewing the evidence in the light most favorable to Rorie, as is required, the Court finds that a reasonable factfinder could conclude that Rorie and Schroeck were similarly situated in that they were not initially aware of the sexual misconduct occurring at their schools until after the investigation began. Indeed, where in Schroeck's case, the sexual abuse was by an adult under his supervision over multiple years, and neither he nor his staff detected it, a reasonable factfinder could conclude that Rorie's failure to act was less severe than that of Schroeck.

Defendants further argue that the incidents differ because unlike Schroeck, Rorie was blamed for failing to detect the abuse and for mishandling the investigation of the incident at her school. This argument is unpersuasive. Whether a member of a protected class is blamed for conduct for which the identified comparator escaped blame is the very heart of the Title VII disparate treatment inquiry. As discussed below, Rorie has presented sufficient evidence to create a genuine issue of material fact on whether she was correctly deemed to be at fault for the handling of the playground incident. *See infra* part II.C. Likewise, while Defendants note that Schroeck was not accused of a second incident of alleged misconduct such as the grade fraud allegations, there is a genuine issue of material fact on whether Rorie was appropriately found to have engaged in grade fraud. *See infra* part II.C. The Court therefore finds sufficient evidence on the fourth prong of a *prima facie* discrimination case.

14

### B.     Legitimate Non-Discriminatory Reasons

When a plaintiff has provided sufficient evidence to demonstrate a *prima facie* case, the next step in the *McDonnell Douglas* analysis is that the defendant has a burden of production to put forth evidence of a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 803; *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Here, Hill, in a declaration, has stated that Rorie was suspended and involuntarily reassigned to a lower-level vice principal position because, in Hill's estimation, Rorie mishandled the playground incident and engaged in grade fraud. The record evidence includes not only Hill's after-the-fact affidavit, but contemporaneous records, including a report in which an investigator, after interviewing Rorie on November 19, 2019 about the playground incident at the request of Hollstein, concluded that the parents should have been contacted prior to dismissal, the students involved in the incident should not have been placed on the bus home together, the alleged perpetrators and victims should not have remained in the same class together, and the CCPS Central Office and the CCSO should have been notified of the incident on the day that it occurred. The record also includes the November 22, 2019 investigation summary by the CCPS Director of Accountability which concluded that the SOAR students had been assigned subjective grades for the first quarter of 2019 at Rorie's direction. Finally, the record includes Hill's December 2, 2019 letter in which she identified both of the asserted grounds for the disciplinary action, which was later referenced by the Chair of the BOE in a December 10, 2019 letter in which Rorie was notified of her right to a hearing. The Court therefore finds that Defendants have met their burden of production on the issue of legitimate, non-discriminatory reasons for the demotion and suspension.

### C.    Pretext

Upon a showing of a legitimate, non-discriminatory reason for a challenged employment action, a plaintiff must demonstrate that the articulated reason was not the true reason for her demotion but instead was a pretext for discrimination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). At this point, the plaintiff's burden to demonstrate pretext has merged with the ultimate burden to prove that the plaintiff has been the victim of intentional discrimination. *Id.* Accordingly, to satisfy the pretext requirement, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Adams v. Trustees of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

"In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons . . . are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225. Here, Rorie has provided evidence that creates a genuine issue of material fact on whether the stated reasons were false or based on mistakes of fact. First, as to the alleged mishandling of the playground incident, Hill listed in the December 2, 2019 letter the specific facts underlying Rorie's alleged misconduct:

- Although a crime was alleged, you did not ensure the allegations were reported to the School Resource Officer for investigation.
- Although sexual harassment was alleged, you did not ensure your trained school-based Title IX coordinators were consulted during the investigation.
- Although sexual harassment and assault were alleged, you did not report the incident to our district Title IX coordinator, Kathy Kiessling.
- You did not submit an Incident Report to inform School Administrators of the incident.
- You moved the aggressors into one of the victim's classrooms.
- You shared confidential information with one of the girl's parents in regard to the consequences issued to the boys.
- You did not ensure proper procedures and follow through with alleged verbal threats to one of the victims.

J.R. 148. Rorie has presented evidence to show that the first four "facts" supporting the finding of misconduct were not fairly attributed to her. Where Rorie was not told of the incident until 5:00 p.m. on October 29, 2019, and was not told that one of the boys had reportedly threatened a sexual assault against one of the girls until she arrived at school the next day, a reasonable factfinder could conclude that the claim that she engaged in misconduct by failing to report the "crime" to the SROs or to file an incident report with the school administration was unfairly based on false information or mistakes of fact, particularly when the SROs were already notified before she arrived the next morning after being on leave. Where Rorie testified in her deposition that the next morning, immediately after she was told of that statement, she called Gill and then Kiessling, she has provided evidence that the claim that she failed to report the incident to Kiessling was not true. Likewise, where Rorie has testified that she was instructed by both Gill and Kiessling that she should let the SROs conduct their investigation, a reasonable factfinder could conclude that the claim that she did not ensure that the school-based Title IX coordinators were consulted during the investigation is pretextual, in that to do so would have been contrary to the contemporaneous instructions by her supervisors.

As for the additional facts, Rorie has provided some evidence that creates a genuine issue of material fact as to whether they provide a fair basis for suspension and demotion. Although Rorie acknowledged playing a role in the decision to move one or more of the boys out of the classroom in which three of the girls were students and into a classroom with the fourth girl, who was not the main victim, she has asserted that the mother of the girl was notified, and she requested that her daughter remain in that classroom. In response to the claim that Rorie did not follow through on an alleged verbal threat against one of the girls by one of the boys while riding the bus home, Rorie stated that she followed a standard procedure by which a threat assessment team

17

consisting of Rorie, Rosin, and Gale-Bailey Title IX Coordinator Michelle Contee reviewed the information, and it determined that the threat was at a level that required no further action. As for the assertion that she shared confidential information about the actions taken against the boys with one of the girl's parents, Rorie explained that when pressed by the girl's parents, she said that disciplinary action would be taken but did not reveal what specific action was taken.

When these explanations are considered, and the evidence is viewed in the light most favorable to Rorie, a reasonable factfinder could conclude that the alleged grounds for misconduct based on the playground incident did not justify the suspension and demotion imposed. Such a conclusion could also be supported by the fact that several of the key alleged missteps—such as letting the children go home without obtaining complete statements and allowing them to ride the bus home together on the day of the incident—were made by Rosin, not Rorie, who was not yet even aware of the playground incident when those decisions were made. Further, the assertion that the community had lost faith in Rorie was based in part on the fact that parents were angry about the lack of information provided about the playground incident, but Rorie had requested permission to send a community letter about it and was denied.

Likewise, as to the alleged grade fraud, Rorie has testified in her deposition that her instructions relating to grades for the SOAR students were in direct response to directives from CCPS Central Office officials, including Hollstein and Sotomayor, that she had to arrange to have grades entered for the SOAR students, even though it was CCPS which had failed to assign a SOAR teacher to the program at Gale-Bailey, and she had told her superiors that the teachers working with the SOAR students were not prepared to enter grades and did not even have access to the online grading system. She also testified that when she was effectively required to arrange for grades but given no guidance on how they should be determined, she instructed the teachers to

base the grades on the students' progress on their IEPs, and she specifically discussed her plan with Sotomayor, who had no objection to it. Notably, Defendants have offered no evidence to refute Rorie's account on these issues, the investigation of the issue was conducted and completed within only four days of November 18, 2019, and there is no evidence that Rorie was even interviewed as part of that inquiry. Under these circumstances, there is a genuine issue of material fact on whether Rorie took her actions relating to the grades at the direction of and with the acquiescence of CCPS management, such that a reasonable factfinder could conclude that the claim that she had actually engaged in "grade fraud" was false and unfair, and that the claim that her conduct warranted demotion and suspension was pretextual.

While Rorie has provided sufficient evidence to support a finding that the reasons for her demotion and suspension—the alleged mishandling of the playground incident and the alleged grade fraud—were pretextual, she must also show that a reasonable factfinder could conclude that the actual reason for these actions was discrimination. On this issue, Rorie relies on the comparator evidence relating to Schroeck. As discussed above, Schroeck presided over a sexual assault scandal which could be viewed as far more severe than the playground incident, in that there was an adult engaged in sexual assault against children while subject to Schroeck's supervision, but Schroeck never discovered the conduct. Though Schroeck had the same position and the same supervisor, he was neither suspended without pay nor demoted; instead, he received a transfer to a lateral administrative position in the Central Office rather than, as in Rorie's case, to a lower-level position that would lead to a lower pay scale after two years. Though Defendants argue that Rorie was appropriately treated more severely because of her mishandling of the playground incident and the alleged grade fraud, as discussed above, there are genuine issues of material fact on whether those issues provided a fair basis for the discipline imposed.

Although Rorie has not presented any direct evidence of racial animus or motivation, the United States Court of Appeals for the Fourth Circuit has found that evidence of a similarly situated comparator can be sufficient to give rise to a reasonable inference of purposeful discrimination requiring that the question go to the factfinder and precluding summary judgment. In *Haynes*, the plaintiff had been terminated from his trash collection job for "job abandonment" after he expressed frustration when his regular truck was not ready, went home, and later claimed that he was sick, and he had had three prior incidents of rules infractions that were later asserted to be part of the termination decision. *Haynes*, 922 F.3d at 222. The Fourth Circuit held that the district court erred in granting summary judgment on the plaintiff's claim of racially discriminatory discipline where the plaintiff had presented evidence of pretext arising from the shifting explanations for the termination, and there was a white comparator with the same supervisor who arguably had more infractions and had yelled at his supervisor but was permitted to return to his job and thus received more favorable treatment. *Haynes*, 922 F.3d at 224. On another occasion, the Fourth Circuit reversed a grant of summary judgment on a claim of discriminatory termination based on disability by a plaintiff who was terminated for avoiding a customer phone call, where there were two comparators with different supervisors who had similarly engaged in avoiding calls but were not terminated. *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 381-83 (4th Cir. 2022) ("Especially relevant to a showing of pretext would be evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably."); *see also Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 428, 435 (W.D. Pa. 2014) (denying a motion for summary judgment where a paramedic terminated for alleged sexual touching of a nurse had identified a similarly situated white paramedic who had struck a patient but was only suspended and not terminated, even without considering whether there was sufficient

evidence of a higher rate of discipline for Black employees). Here, Rorie has likewise presented evidence of a similarly situated comparator upon which a reasonable factfinder, viewing the facts in the light most favorable to the plaintiff, could base a finding of discriminatory discipline.

Finally, the Court notes that for a claim of race discrimination, it is not necessary that Rorie establish that race was the sole reason or even a but-for cause of her termination; rather it is sufficient to establish liability that it was a "motivating factor" in the decision. 42 U.S.C. § 2000e–2(m). Thus, even if the factfinder were to conclude that Rorie's demotion and suspension were motivated in part by other considerations, such as an interest in finding a scapegoat for this incident to draw negative attention away from the superintendent or the CCPS Central Office, it could still find liability if it concludes that the level of discipline was motivated in part by race. For these reasons, the Motion will be denied as to Rorie's Title VII and § 1983 race discrimination claims in Counts 1, 3, and 4.

## III.    Age Discrimination

The ADEA prohibits discrimination in employment on the basis of age, defined as protecting individuals who are 40 years of age or older. 29 U.S.C. § 631(a). Claims brought under the ADEA follow a similar burden-shifting framework as those under Title VII. To establish a *prima facie* case of age discrimination, a plaintiff must establish that (1) the plaintiff is over 40 years of age; (2) the plaintiff was subjected to an adverse employment action; (3) the plaintiff had satisfactory job performance at the time of the adverse action; and (4) the plaintiff was replaced by or treated less favorably than a "substantially younger" worker. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310, 313 (1996); *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019); *Sullivan v. Perdue Farms, Inc.*, 133 F.Supp.3d 828, 837 (E.D. Va. 2015) (citing *O'Connor*). If such a showing is made, the employer must present evidence of a legitimate,

21

non-discriminatory reason for the adverse action. *Westmoreland*, 924 F.3d at 725. Upon such a showing, the plaintiff then must establish that the proffered reason was not the true reason, but was a pretext for discrimination. *Id.* at 726. To meet this requirement, the plaintiff must show that the proffered reason was unworthy of credence in a manner that supports an inference of discrimination, or provide other forms of evidence sufficiently probative to establish intentional discrimination. *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). In ADEA cases, unlike in the Title VII context, the plaintiff's burden to rebut the employer's stated reason and show that it was pretextual is to demonstrate, "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 180 (2009).

Here, much of the analysis mirrors the analysis for the race discrimination claims. The evidence is sufficient to establish a *prima facie* case because it demonstrates that Rorie had satisfactory job performance and was subjected to an adverse employment action. *See supra* part II.A. At the time of the demotion and suspension, Rorie was 60 years of age and was thus in the protected class. The comparator, Schroeck, was 50 years old at the time of his transfer and thus was arguably "substantially younger" than Rorie. *O'Connor*, 517 U.S. at 313; *Tolley v. Health Care & Ret. Corp.*, 133 F.3d 917, 1998 WL 24972, at *3 (4th Cir. 1998) (unpublished) (considering an ADEA claim where the plaintiff was 51 years old and the comparator was 42 years old, but rejecting the claim on other grounds). The evidence also shows that Defendants have provided evidence of legitimate, non-discriminatory reasons for the adverse employment actions against Rorie. *See supra* part II.B. Likewise, the same evidence creating a genuine issue of material fact on whether the reasons were false or pretextual in the context of race discrimination applies here. *See supra* part II.C.

22

There are, however, meaningful differences in the evidence and analysis relating to the age discrimination claim. First, as Defendants have noted, the decisionmaker for the demotion and suspension, Hill, was 57 years old at the time and thus was a member of the protected class. Though not dispositive, the fact that the decisionmaker for the adverse employment action belongs to the same protected class as the plaintiff is probative of a lack of discriminatory intent. *See Love v. Alamance County Bd. of Educ.*, 757 F.2d 1504, 1509 (4th Cir. 1985) (stating that the presence of women and African Americans on the relevant selection committees was "an intentional safeguard against discriminatory practices"); *Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation."). Where Hill, a white woman, is not in the protected class for purposes of the race discrimination claim, the evidence in support of an inference of age discrimination is less compelling than for the race discrimination claim.

Second, the requirements for showing an inference of discrimination on an ADEA claim differ from those for a Title VII race discrimination claim in that while a race discrimination plaintiff need only show that race was a "motivating factor" in the decision, an age discrimination plaintiff must prove but-for causation: that the employer "would not have" taken the adverse employment action "in the absence of age discrimination." *Westmoreland*, 924 F.3d at 725; *see Gross*, 557 U.S. at 180. The but-for standard for ADEA claims is an "elevated . . . burden of proof" under which "the plaintiff must present evidence that discriminatory animus was a 'necessary logical condition' for the adverse employment action and that the employer did not act 'because' of other legitimate motivations for the action." *Arthur v. Pet Dairy*, 593 F. App'x 211, 219 (4th Cir. 2015) (quoting *Gross*, 557 U.S. at 176).

Here, there is evidence of other potential motivations for the level of discipline imposed, including the fact that the playground incident was widely discussed on social media and was "talked about all over the county," J.R. 52, and Rorie's own testimony that she believed that Hill was upset that she learned of the playground incident through a phone call from a BOE member who heard about it from a Gale-Bailey teacher.

In light of this higher standard and the evidence of other motivations, the fact that the decisionmaker is a member of the protected class for age discrimination, and the fact that evidence of discriminatory intent is limited to the comparator evidence, the Court finds that the evidence does not support a finding that age discrimination was the but-for cause of her demotion and suspension. The Court will therefore grant the Motion as to the ADEA claim in Count 2.

## IV.   Retaliation

In Counts 11 and 12, Rorie asserts claims of retaliation under Title VII and the ADEA. Title VII bars employers from taking a materially adverse action against an employee in retaliation for opposing an unlawful employment practice covered under the statute, such as for making a complaint of race discrimination. *See* 42 U.S.C. § 2000e-3(a). The ADEA similarly bars retaliation against employees who assert a claim of age discrimination. 29 U.S.C. § 623(d). To prove a claim of unlawful retaliation, a plaintiff must demonstrate that (1) the plaintiff engaged in "protected activity," such as a complaint of discrimination; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a "causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018). If these elements of a *prima facie* case are established, the employer must produce evidence of a legitimate, non-retaliatory reason for the materially adverse action. *Laber v. Harvey*, 438 F.3d 404, 431 (4th Cir. 2006) (applying the *McDonnell Douglas* framework to a retaliation claim). If

24

this requirement is met, the plaintiff must then show that the employer's reason was pretextual in that it was false and that retaliation was the real reason. *Id.*

Rorie has demonstrated that she engaged in protected activity by filing a charge of discrimination with the EEOC on May 15, 2020. However, she has not demonstrated that Defendants engaged in a materially adverse action against her after that filing. For purposes of a retaliation claim, a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Ray*, 909 F.3d at 670. It must have "some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Ray*, 909 F.3d at 670.

Here, the adverse action which Rorie challenges—her demotion and suspension—occurred in November 2019, long before the filing of the Charge in May 2020, which is the only protected activity she identifies. Rorie has not shown any evidence that she was subjected to a materially adverse action after the filing of the Charge. Rorie alleges only that the BOE's inclusion of Hill's December 2, 2019 letter with its June 16, 2020 response to the Charge was retaliatory because up to that point, she had never seen the letter. Although Rorie has claimed that she was not actually provided with the letter in December 2019, she does not claim, and has not provided evidence to support a finding, that the letter was not drafted in that time frame or that it was drafted for the first time after the Charge was filed in May 2020. Indeed, she acknowledged in her deposition that the December 10, 2019 letter from the Chair of the BOE, which she did receive, referenced the December 2, 2019 letter. Under these circumstances, the fact that Defendants included with their response to the Charge a previously drafted letter of which Rorie had been informed cannot reasonably be construed as a materially adverse action that could support a claim

25

of retaliation, particularly when the whole point of a response to the EEOC is to explain why the employer took the action underlying the charge of discrimination. The Court will therefore grant the Motion as to the retaliation claims in Counts 11 and 12.

## V.    Due Process

Defendants also seek summary judgment on Rorie's due process claim, which is based on the alleged failure to provide her with notice of the reasons for the proposed discipline, consisting of her demotion and suspension, and of her right to a hearing. A violation of a plaintiff's due process rights is determined through a two-step process. First, the court must determine "[w]hether any procedural protections are due" by deciding whether "a liberty or property" interest within the meaning of the Fourteenth Amendment's Due Process Clause is at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Second, should the Due Process Clause attach, the court determines "what process is due," keeping in mind that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

Defendants acknowledge that CCPS employees have a due process right relating to a suspension, pursuant to Section 6-202 of the Education Article of Maryland Code ("Section 6-202"), which provides a right to notice and hearing before a suspension or termination. *See* Md. Code Ann., Educ. § 6-202(a)(1) (West 2018). They argue, however, that they are entitled to summary judgment because CCPS records do not show that Rorie actually served a suspension and was not paid for the five-day period. In contrast, Rorie has maintained consistently that she was subject to a five-day suspension without pay. Significantly, the BOE specifically confirmed in its submission to the EEOC on June 16, 2020 that Rorie had been suspended without pay. Further, there are reasons to question the accuracy of the records provided by Defendants to show that Rorie was not suspended, as they do not reflect Rorie's undisputed sick leave on October 29,

2019. The Court therefore finds that there is a genuine issue of material fact on whether Rorie was actually suspended.

As for the demotion to a vice principal position, Defendants argue that Rorie has no due process right relating to that demotion because that action was technically an involuntary transfer, and this type of reassignment is not governed by Section 6-202, which provides a right to notice and a hearing before a suspension or termination. *Id.* § 6-202. This Court, however, addressed this issue in the related civil action brought by Rosin and concluded that there is a due process interest. *Rosin v. Hill*, No. TDC-21-0983, 2022 WL 3621478, at *3-4 (D. Md. Aug. 23, 2022).

Nevertheless, the Court finds that the record evidence does not support Rorie's due process claims. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the United States Supreme Court held that while property interests "are created . . . from an independent source such as state law," *id.* at 538 (citing *Roth*, 408 U.S. at 577), "[t]he right to due process 'is conferred, not by legislative grace, but by constitutional guarantee,'" so that once a property interest in public employment is conferred, a state "may not constitutionally authorize the deprivation of such an interest . . . without appropriate procedural safeguards,'" *id.* at 541 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring)). Based on this principle, the Court further held that "once it is determined that the Due Process Clause applies, 'the question remains what process is due.' The answer to that question is not to be found in the [state] statute." *Id.* at 541 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Similarly, in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), the Supreme Court stated that in the context of due process claims:

> Because minimum [procedural] requirements are a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action. Indeed, any other conclusion would allow the State to destroy at will virtually any state-created property interest.

27

*Id.* at 432. Thus, under *Loudermill* and *Logan*, the contours of Rorie's rights under the Due Process Clause of the Fourteenth Amendment are not necessarily determined by the procedures described in any of the referenced state statutes, or any CCPS policy, but by federal constitutional principles of due process.

In the case of discharge from public employment, due process requires that a public employee with a property interest in employment receive "oral or written notice of the charges," an explanation of the evidence, and an opportunity to give the employee's side of the story. *Loudermill*, 470 U.S. at 546; *Garraghty v. Jordan*, 830 F.2d 1295, 1300 (4th Cir. 1987). For a suspension, the minimum procedural safeguards are "notice of the charges" against the employee "and some kind of a hearing." *Garraghty*, 830 F.2d at 1300. In *Garraghty*, the court held that a public employee for whom a five-day suspension was proposed received due process based on an informal meeting in the supervisor's office during which the plaintiff was told of the potential suspension and given an opportunity to explain his behavior before it was imposed. *Id.* at 1301-02. Although the process required in relation to a demotion such as the reassignment to a vice principal position is less well-defined, Rorie does not argue that she was entitled to more than notice of the charges against her and the opportunity for a hearing.

Here, while Rorie disputes whether she was provided with a copy of the December 2, 2019 letter, she acknowledged in her deposition that she met with Hollstein on November 26, 2019, that both the playground incident and the alleged grade fraud were discussed, and that she was told that she was being reassigned to the vice principal position and was being recommended for a five-day suspension. According to a declaration from Hill, at the November 26 meeting, Hollstein told Rorie of the basis for her reassignment and the suspension recommendation. Rorie, who acknowledged that "[m]aybe there were some more things said" at the meeting, does not deny that

28

she was made aware at that time that these incidents were the basis for her suspension and demotion. J.R. 59. Moreover, there is no dispute that Rorie received the December 10, 2019 letter from the Chair of the BOE informing her of the potential suspension and her right to a hearing. Rorie also acknowledged that she received the advice of her union representative on whether to pursue a hearing and made a specific decision not to request a hearing, and that when she decided not to pursue an appeal, she understood that the allegations included the claim of grade fraud. Thus, there is no genuine issue of material fact on the issue of whether Rorie had actual notice of the charges and knowledge of her right to a hearing as needed to satisfy due process. *See Garraghty*, 830 F.2d at 1300. The Motion will therefore be granted with respect to the due process claim.

## VI.    Defamation

In her defamation claims, Rorie complains of two statements in the media. First, she identifies as defamatory the statement by O'Malley-Simpson, published in the Southern Maryland Chronicle, that "This is not the way this type of case should be handled and the individuals involved in making that decision are being retrained in the proper procedures and responses." J.R. 218. Second, she identifies the statement, as reported by Fox News 8 on November 24, 2019, that Hill "promised staff members would be retrained before adding, 'I apologize to you for what happened to your daughter and any other child in this situation because it shouldn't happen.'" J.R. 223. In resolving the Motion to Dismiss, the Court narrowed the claim relating to the second statement to Hill's assertion that staff members would be retrained. *Rorie I*, 2021 WL 4290872, at *11.

Defendants argue that the evidence does not support a finding of defamation. A plaintiff in a defamation case must demonstrate that "the defendant made a defamatory statement to a third

29

person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). A defamatory statement is one which "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Lindenmuth v. McCreer*, 165 A.3d 544, 552 (Md. Ct. Spec. App. 2017). To determine whether a statement is defamatory, a court must look to the whole publication in context; "a meaning not warranted by the whole publication should not be imputed." *Piscatelli v. Smith*, 35 A.3d 1140, 1147 (Md. 2012). A statement is false when it is "not substantially correct." *Id.*

In the Motion, Defendants do not dispute the first element, that the statements were defamatory. Although Defendants argue that the second element is not satisfied because the statements were "entirely accurate," Mot. Summ. J. at 19, ECF No. 52-1, Rorie has stated that she was never retrained on the procedures relevant to the playground incident. Indeed, Defendants have identified no evidence of such retraining. Thus, there is, at a minimum, a genuine issue of material fact on this point.

On the third element, to be legally at fault, the plaintiff must make a showing that, at a minimum, the party making the false statement acted negligently. *Hearst Corp. v. Hughes*, 466 A.2d 486, 491 (Md. 1983). However, when, as here, the plaintiff is a public official, the standard is actual malice. *Capital-Gazette Newspapers, Inc. v. Stack*, 445 A.2d 1038, 1043 (Md. 1982); *Kapiloff v. Dunn*, 343 A.2d 251, 258 (Md. Ct. Spec. App. 1975) (finding that the plaintiff, a high school principal, was a public official for purposes of a libel claim). Actual malice is established by showing that the speaker made the statement with actual knowledge that it was false or with reckless disregard for its truth. *Hearst Corp.*, 466 A.2d at 490. The record is largely devoid of

30

evidence of whether Hill or O'Malley-Simpson knew specifically whether retraining had occurred or would occur.  If anything, a statement in the December 2, 2019 letter to Rorie that "you will receive additional training," J.R. 149, suggests that these officials may have believed that training was warranted and forthcoming at the time of the November 2019 public statements.  At the same time, however, as discussed above, Rorie has presented evidence that creates a genuine issue of material fact on whether the stated reasons for her demotion and suspension were pretextual.  Under these circumstances, and where the facts on summary judgment must be viewed in the light most favorable to the non-moving party, the Court concludes that there is sufficient evidence to support a finding that the statements that Rorie and others would be retrained were made with actual malice.

Rorie's defamation claims, however, fail as to the fourth element, harm.  The standard for establishing harm is different depending on whether the statement was defamatory *per se* or defamatory *per quod.*  A statement is defamatory *per se* when its injurious character is self-evident, otherwise, it is defamatory *per quod,* and there must be evidence presented that the words "caused actual damage." *Metromedia, Inc. v. Hillman,* 400 A.2d 1117, 1119 (Md. 1979); *Samuels v. Tschechtelin,* 763 A.2d 209, 244 (Md. Ct. Spec. App. 2000); *Gooch v. Md. Mech. Sys., Inc.,* 567 A.2d 954, 961-62 (Md. Ct. Spec. App. 1990).   Here, the statements about retraining were defamatory *per quod* because their defamatory nature arises only in the context of the overall playground incident and depends on the implication that if Rorie requires retraining, she must have failed at her job or engaged in misconduct.

A review of the record reveals that Rorie has not provided any evidence of specific damages arising from these public statements.  Although Rorie testified that Hill's determinations that she had mishandled the playground incident and engaged in misconduct relating to grade fraud

were "career ending," J.R. 73, there is no evidence that Hill's decisions were negatively influenced by the public statements; rather, the statements were made either by Hill herself or by her spokesperson. Significantly, there was no evidence presented of anyone else, whether a prospective employer or otherwise, reacting to these public statements negatively and causing harm to Rorie, whether by declining to hire her or otherwise. Rorie thus has not presented sufficient evidence to show that the alleged defamatory statements caused the actual damages required to support a defamation claim based on a statement that was defamatory *per quod*. Accordingly, the Motion will be granted as to the defamation claims. The Court need not address Defendants' alternative arguments relating to defamation.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the age discrimination claim in Count 2; the retaliation claims in Counts 11 and 12; the due process claim in Count 7; and the defamation claims in Count 13 and 14. The Motion will be denied as to the race discrimination claims in Counts 1, 3, and 4. A separate Order shall issue.

Date:   January 31, 2023

THEODORE D. CHUANG
United States District Judge

32